UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MRS. VALERIE L. RHODES (Drayton),

                    Plaintiff,

          v.

P.O. ANTHONY SANFORD, et al.,

                    Defendants.

_____

DECISION & ORDER

11-CV-6081P

## PRELIMINARY STATEMENT

Plaintiff Valerie Rhodes ("Rhodes") has initiated this action under 42 U.S.C.

§ 1983 against Anthony Sanford ("Sandford") and the Village of Bath Police Department

("Police Department").  (Docket # 1).  Her complaint alleges two claims arising from her arrest

on December 18, 2010:  the first, a claim against Sanford, an officer with the Police Department,

for excessive force in effectuating the arrest; the second, a claim against the Police Department

for "covering up for him."  (*Id.*).  Currently before the Court is defendants' motion for summary

judgment on both claims.  (Docket # 34).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States

magistrate judge conduct all further proceedings in this case, including the entry of final

judgment.  (Docket # 11).

## FACTUAL BACKGROUND

The following facts are derived from the parties' statements of material facts submitted pursuant to Rule 56.1 of the Local Rules of Civil Procedure for the Western District of New York.  (Docket # 34-4; # 38 at 4-6).  They are undisputed except where otherwise noted.

On December 18, 2010, at approximately 11:30 p.m., defendant Sanford, while on patrol duty, observed a vehicle driving with defective tail lights on West Morris Street in the Village of Bath.  (Docket # 34-4, ¶ 1; # 38 at 5).  Sanford initiated a traffic stop and approached the driver's side of the car.  (Docket # 34-4, ¶¶ 2-3; # 38 at 5).  Sanford informed the driver, plaintiff Rhodes, that the reason he had pulled her over was because she was operating a car with defective tail lights.  (Docket # 34-4, ¶ 5; # 38 at 5).  The passenger, Aliesha Davis ("Davis"), informed Sanford that she owned the car and had planned to have the tail light repaired.  (Docket # 34-4, ¶ 6; # 38 at 5).

Sanford observed that Rhodes had glassy and bloodshot eyes and smelled an odor of alcohol "emanating from her."  (Docket # 34-4, ¶ 4; # 38 at 5).  Sanford asked her if she had been drinking.  (Docket # 34-4, ¶ 7; # 38 at 5).  According to Sanford, she responded, "a few"; according to Rhodes, she responded, "yes, one beer."  (*Id.*).  Sanford further observed that Rhodes's speech was "slow and deliberate" and characterized by "broken sentences."  (Docket # 34-4, ¶ 7).  Sanford asked Rhodes for her driver's license, and Rhodes admitted that she did not have one.  (Docket # 34-4, ¶ 8; # 38 at 5).

Sanford ordered Rhodes to exit the car.  (Docket # 34-4, ¶ 9; # 38 at 5).  Sanford claims that as she did, he heard her step on a beverage can and then observed a spilled can of

2

beer on the driver's side floor board.  (Docket # 34-4, ¶ 9).  Rhodes concedes that she had an

open container in the car, but disputes that she stepped on it.  (Docket # 38 at 5).

Sanford administered a series of roadside sobriety tests to Rhodes, which she

failed.  (Docket # 34-4, ¶ 10; # 38 at 5).  He also administered a blood alcohol content field test,

which yielded a result of .13%, or .05% higher than the legal limit.  (Docket # 34-4, ¶ 11; # 38 at

5).  Rhodes disputes that her blood alcohol content was over the legal limit.  (Docket # 38 at 5).

At that point, Sanford advised Rhodes that she was under arrest and directed her to turn around

and put her hands behind her back.  (Docket # 34-4, ¶ 12; # 38 at 5).  Rhodes complied.  (*Id.*).

The parties' accounts of the events immediately thereafter sharply diverge.

Rhodes contends that when Sanford applied the handcuffs to her left wrist, she experienced a

surge of pain caused by pressure on a preexisting wrist injury.  (Docket # 38 at 5, 7).  As a result,

her arm jerked, and she pleaded with Sanford to loosen the cuff.  (*Id.*).  At that point, according

to Rhodes, Sanford forcefully pushed his hand into the back of her head and neck area, and

slammed her into the ground face-first, causing her to fall and injure herself.  (*Id.*).

Sanford admits that he caused Rhodes to fall to the ground, but disputes her

version of how she ended up on the ground.  He claims that when he attempted to apply the

handcuffs, she jerked her right arm away from him, turned to face him and yelled, "No, Officer!"

(Docket # 34-4, ¶ 13).  He placed his right hand on her shoulder and pulled her right arm towards

him in order to try to apply the other handcuff to her wrist.  (*Id.*, ¶ 14).  According to him,

Rhodes then yelled, "You can't do this to me.  I have a four month old daughter!"  (*Id.*).  She

pulled away from him, and Sanford lost his grasp on her, but managed to grab the loose handcuff.

(*Id.*).  Rhodes ran approximately four steps towards the driver's side of the car, with Sanford

holding onto the unapplied cuff.  (*Id.*, ¶ 15).  Sanford pushed her against the car, but Rhodes was able to push back against the car and "stepped toward the roadway."  (*Id.*, ¶¶ 15-16).  To avoid a possible struggle in the road, Sanford pulled her by her wrist toward the side of the road

> and placed his right hand on her left upper arm and pulled her in a semicircular motion toward the grassy area on the side of the road[, and] then stuck his right leg in front of plaintiff and forced her to the ground, where she fell striking her chest and chin.

(*Id.*, ¶ 16).  Sanford then successfully applied the handcuffs.  (*Id.*).

Rhodes sustained a broken jaw, a broken tooth, a dislocated thumb and facial abrasions and contusions.  (Docket #1; # 38 at 4; # 39-2, ¶ 1).  She requested an ambulance, and Sanford arranged for an ambulance to meet them at police headquarters.  (Docket # 34-4, ¶ 17; # 38 at 5).  Rhodes was evaluated by the emergency medical personnel and taken to the hospital for evaluation and treatment of her injuries.  (Docket # 34-4, ¶¶ 18-19; # 38 at 5).

At the police station, Davis, the passenger who had been in the car with Rhodes, provided a sworn statement under penalty of perjury.  She stated that after Sanford instructed Rhodes to exit the car:

> [t]hey walked to the area behind my vehicle and in front of the police car that was behind us.  I was busy texting on my phone at the time.  I heard her counting and at one point I heard the officer tell [her] she was under arrest and to put her hands behind her back.  [Rhodes] kept screaming NO and was shouting obscenities. I wasn't paying much attention and [Rhodes] is my friend.  I don't want to get her into any trouble.  Chief Rouse asked me if the police officer was acting inappropriately and I don't believe that. [Rhodes] was drunk and it appears that she resisted arrest.

(Docket # 34, Exhibit ("Ex.") L).  Rhodes contends that Davis told her that the police coerced her statement by threatening that she would be jailed and "told her to say she did not see anything."

(Docket # 38 at 6).  Rhodes has not submitted an affidavit from Davis disavowing the sworn

statement she provided the police on the night of Rhodes's arrest.

Rhodes was charged with driving while intoxicated, resisting arrest, consumption

and possession of alcohol in a motor vehicle, operating a vehicle without functioning tail lights

and operating a vehicle without a driver's license.  (Docket # 34-4, ¶ 20; # 38 at 5).  Rhodes pled

guilty to a misdemeanor charge of driving while intoxicated in full satisfaction of all other

charges.  (Docket # 34-4, ¶ 21; # 38 at 5).


## DISCUSSION

### I.  Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any

disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

(1986); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A fact

is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000).  A

dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Konikoff v.*

*Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . .  [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II.  Rhodes's Claim of Excessive Force against Sanford

In her first claim, Rhodes asserts that Sanford subjected her to excessive force at the time of her arrest.  Sanford argues that summary judgment in his favor is warranted on this claim because Rhodes cannot raise a disputed issue of material fact that Sanford subjected her to excessive force.  He further maintains that, even if she could, he is entitled to qualified immunity.

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct (1) was "committed by a person acting under color of state law;" and (2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). By itself, Section 1983 creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, no genuine dispute exists that Sanford was acting under color of state law. Rather, the central inquiry is whether Sanford's actions violated Rhodes's constitutional rights.

Claims arising from the use of force during an arrest are judged by the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determination of whether the amount of force used to seize someone was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted).

Courts have long recognized that a police officer's right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotations omitted). A police officer's application of force is excessive if it

7

is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.* at 397.

Evaluation of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Burke v. Cicero Police Dep't*, 2010 WL 1235411, *9 (N.D.N.Y. 2010).

Rhodes concedes that probable cause existed for her arrest (Docket # 38 at 13) and thus implicitly concedes that Sanford was authorized to use some degree of force or the threat thereof to effect that arrest. She maintains, however, that the amount of force Sanford used was excessive.

Sanford contends that Rhodes cannot raise a genuine dispute of material fact as to the reasonableness of the force used by Sanford to complete the arrest. To support his contention, Sanford relies upon an excerpt of Rhodes's deposition testimony in which she purportedly conceded that she remembers nothing between the time that Sanford placed the handcuff on her left wrist, causing it to jerk, and the time that she was placed into the patrol car and discovered that her tooth had been knocked loose. (Docket # 34-6 at 2, ¶ 5). Her inability to recall what transpired, according to Sanford, renders her incapable of disputing Sanford's version of the events during that time period.

The deficiency in Sanford's argument is not legal, but factual. Reading Rhodes's deposition testimony in its entirety, and considering the testimony Sanford cites in the context of

8

the rest of the testimony, I conclude that Sanford has unfairly construed her testimony.  Rather, I find that in her deposition testimony – just as in her complaint and her papers opposing the pending summary judgment motion – Rhodes consistently maintained that after she felt the surge of pain and jerked her arm, she "felt something on the back of [her] neck when he pushed me down to the ground."  (Docket # 34-4, Ex. C at 75).

Defendants are correct that in response to the subsequent question by counsel, "what is the *next* thing you remember after Officer Sanford put the cuff on your left wrist," Rhodes stated "[p]utting my front tooth back up into my mouth . . . [i]n the back of the police car."  (*Id.* at 77 (emphasis added)).  To interpret Rhodes's single response to this question as a concession that she has no recollection of anything between the cuffing and the car ignores both her earlier testimony that she recalls being pushed to the ground by the back of the neck and her later testimony reaffirming her recollection.  Indeed, when counsel followed up by asking Rhodes,

> [s]o, whatever happened between the time Officer Sanford put the left cuff on your wrist between the bump and your hand and putting your tooth back in your mouth while sitting in the police car, you don't remember what happened between those time, correct?

Rhodes responded, "I remember – I just – just what I told you, just what I just told you."  (*Id.*).

Significantly, counsel continued this line of inquiry, but did not furnish that testimony to the Court in connection with the pending motion.  That testimony again reaffirms Rhodes's recollection:

> Q.    And then I asked you what's the next thing you remember after that, and you said you were putting your front tooth back into your mouth while sitting in the police car.

A.      Right.

Q.      So, between him putting the cuff on your wrist and you sitting in the police car, putting the tooth back in your mouth, you don't remember what happened in between those two times, correct?

A.      No.

Q.      All right.  No, that's not correct, or no, you don't recall?

A.      No, I don't recall.  I mean, *I recall him arresting me, asking me, and putting his hand on the back of my head, and me going, like, down after that*.  I don't know.  I mean - -

Q.      Well, where were you when you went down?  Do you remember?

A.      Where was I on, like, the side of the street?

Q.      Okay.  Well, what I want to know is, when did that happen in relation to when you were in the police car putting your tooth back in your mouth?

A.      It was very fast.  It happened very quickly.

(Docket # 40-1 at 23 (emphasis added)).

Indeed, Rhodes has consistently maintained throughout this litigation that Sanford slammed her to the ground face-first by forcefully pushing her from behind the back of the head. Her complaint alleges, "[Sanford] asked me to put my hands behind my back and I did what he asked then he slammed me down on the ground grab me behind the back of my head and slammed my head to the grass which was dirt and broke my jaw, other injuries."  (Docket # 1). In her statement of undisputed facts submitted in opposition to this motion, she likewise asserts, "[the] police officer used unnecessary excessive force by slamming me face first into the ground forcefully holding his hand on the back of my head."  (Docket # 38 at 4).

10

Sanford's reliance on Rhodes's answer to a single question and disregard of her several sworn statements to the contrary at her deposition inaccurately and unfairly construes her testimony.  In sum, I find that Rhodes's *pro se* papers adequately raise a disputed issue of material fact, namely, whether Sanford forcefully pushed Rhodes from the back of her head into the ground face-first in response to her left wrist jerk or whether she attempted to evade the cuffing, ran back to the car and veered into the roadway, prompting Sanford to take her to the ground by placing his right hand on her upper arm, pulling her to the grassy area and tripping her. (*Compare* Docket # 38 at 5 *with* Docket # 34-1 at ¶ 20).  Significantly, Sanford disputes that he ever took her to the ground by pushing or shoving her from behind the head.  (Docket # 39-2 at ¶ 2).

Rhodes's version of events, which is obviously vigorously disputed by Sanford, is nonetheless sufficient to create a triable issue of material fact and defeat summary judgment. *See*, *e.g.*, *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (summary judgment inappropriate where parties' factual recitations differed regarding the arrest and the amount of force used); *Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 75-76 (E.D.N.Y. 2012) (summary judgment not warranted where plaintiff's evidence, accepted as true and "drawing all reasonable inferences in plaintiff's favor," created issue of fact whether officer used excessive force); *Burke v. Cicero Police Dep't*, 2010 WL 1235411 at *10 (issue of fact precluded summary judgment where plaintiff contended that she did not resist arrest and that officer "forcibly grabbed [her] wrist[,] pulled it behind [her] back and handcuffed [her]"); *Benson v. Yaeger*, 2009 WL 1584324, *5-6 (W.D.N.Y. 2009) (disputed facts regarding amount of force used by officer precluded summary judgment on excessive force claim); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 342-43

(E.D.N.Y. 2006) (allegations that plaintiff did not resist arrest and that officers continued to use force after plaintiff had been subdued precluded summary judgment) (collecting cases).  Of course, the jury's determination of which account to credit likely will turn on their assessment of the credibility of the witnesses – a determination plainly within their province.  *See Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 221 (W.D.N.Y. 2012) ("[a]lthough [d]efendants reject this account of the arrest, 'credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)); *Williams v. Raimo*, 2011 WL 6026115, *8 (N.D.N.Y.) ("[t]he rule in determining whether to grant summary judgment is that credibility determinations, weighing evidence, and drawing inferences are functions for the jury, not the court") (internal citation omitted), *report and recommendation adopted*, 2011 WL 602611 (N.D.N.Y. 2011).

The conclusion that factual disputes preclude summary resolution of the excessive force claims also precludes a finding that Sanford is entitled to qualified immunity with respect to the excessive force claims.  "The reasonableness of a police officer's conduct is at issue in both a Fourth Amendment excessive force analysis as well as step two of the qualified immunity test." *Benson v. Yaeger*, 2009 WL 1584324 at *6.  Thus, in excessive force cases, the qualified immunity and Fourth Amendment analyses often overlap and present a single question: "[w]hether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Id.* (quoting *Pub. Adm'r of Queen Cnty. ex rel. Estate & Beneficiaries of Guzman v. City of New York*, 2009 WL 498976, *5 (S.D.N.Y. 2009)).  In this case, my conclusion that issues of material fact exist as to the reasonableness of

12

the officer's use of force leads me to conclude that denial of summary judgment on the grounds

of qualified immunity is also appropriate. *See, e.g., Breen v. Garrison*, 169 F.3d at 153 (issues of

fact on reasonableness of force used preclude summary judgment on defense of qualified

immunity); *see Burke*, 2010 WL 1235411 at *11 (conclusion that issues of fact preclude

summary judgment on excessive force claims also precludes summary judgment on qualified

immunity grounds); *Ostroski v. Town of Southold*, 443 F. Supp. 2d at 343 (defendants not

entitled to summary judgment on qualified immunity where issues of fact precluded summary

judgment on excessive force claim; "[i]f the jury determines the plaintiff's account of event is

accurate, this case does not involve 'the hazy border between excessive and acceptable force'")

(quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

   For the foregoing reasons, defendants' motion for summary judgment on

Rhodes's claim against Sanford for excessive force is denied.


## III. <u>Rhodes's Claim against the Police Department</u>

   Defendants also seek summary judgment on Rhodes's Section 1983 claim

asserted against the Police Department.  Although the basis of her claim against the Department

is not entirely clear from the pleadings, it appears to rest on her contention that the Department

coerced Davis into providing a false sworn statement and did not immediately take her to the

hospital.  (*See* Docket # 38 at 13).

   As an initial matter, the Police Department is not a proper defendant in a Section

1983 suit.  *See Petaway v. City of New Haven Police Dep't*, 541 F. Supp. 2d 504, 510 (D. Conn.

2008) ("[a]lthough a municipality is subject to suit pursuant to 42 U.S.C. § 1983 . . . , a

municipal police department is not") (internal citation omitted); *see Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 648 n.1 (S.D.N.Y. 2000) ("[i]t is well settled that in a suit alleging deprivation of constitutional rights by an agency or a municipality, such as a police department, the municipality, not the agency, is the real party in interest, and the proper named party in the action").  Even if it were, Rhodes has not adduced any evidence in admissible form that Davis's statement was either coerced or inaccurate.  Rhodes's unsworn statements that Davis told her that officers had pressured her into providing a false statement constitute inadmissable hearsay and are insufficient to create a triable issue of material fact.  *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (plaintiff's assertion in affidavit concerning what a third party told plaintiff insufficient to create issue of fact where plaintiff did not submit sworn statement from the third party); *Schweit v. City of New York*, 2007 WL 1133440, *7 (E.D.N.Y. 2007) (plaintiff's assertions concerning what other people told him were "inadmissible hearsay and may not be relied upon to defeat summary judgment motions").

    The other facet of her claim – that the Department is liable for damages under Section 1983 for the failure to transport her immediately to the hospital, rather than arrange for the ambulance to meet her at the police headquarters – is equally unavailing.  No Section 1983 claims lies for delay in medical treatment, "unless th[at] delay caused substantial harm." *Williams v. Raimo*, 2011 WL 6026111, *5 (N.D.N.Y. 2011) (quoting *Evan v. Manos*, 336 F. Supp. 2d 255, 262 (W.D.N.Y. 2004)); *see Frank v. Cnty. of Ontario*, 884 F. Supp. 2d 11, 19 (W.D.N.Y. 2012) (proper inquiry is whether delay itself was sufficiently harmful to constitute constitutional violation).  Rhodes has come forward with no evidence that any delay in medical treatment, even if one occurred, resulted in a "worsen[ing]" of her condition or resulted in "any

14

further harm." *See Graham v. Wright*, 2004 WL 1794503, *4 (S.D.N.Y. 2004), *aff'd*, 136

F. App'x 418 (2005).

   Finally, to the extent that Rhodes may seek to premise municipal liability on the

Department or the Village on the basis of Sanford's alleged excessive force, that claim also fails.

"[A] municipality cannot be held liable under section 1983 for the tortious conduct of its

employees based on a *respondeat superior* theory." *Pierce v. Ottoway*, 2009 WL 749862, *5

(W.D.N.Y. 2009) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691

(1978)). In order for Rhodes to establish municipal liability under Section 1983, she must show

that Sanford's challenged actions were "performed pursuant to a municipal custom or policy."

*Id.* "The alleged custom or practice need not be embodied in a rule or regulation[;] . . .

[h]owever, the alleged practice 'must be so manifest as to imply the constructive acquiescence of

senior policy-making officials.'" *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)

(internal citation omitted) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871

(2d Cir. 1992)).

   In this case, Rhodes has failed to identify any specific policy or practice that

promoted, encouraged or condoned the use of excessive force by police officers. Accordingly,

summary judgment is appropriate. *See*, *e.g.*, *Pierce v. Ottoway*, 2009 WL 749862 at *6 (plaintiff

presented no factual allegations "other than the events which took place at plaintiff's residence";

"an inference of a custom or policy cannot be drawn from a single incident in the complaint")

(internal quotation omitted); *Houghton v. Cardone*, 295 F. Supp. 2d 268, 279 (W.D.N.Y. 2003)

("a single incident alleged in a complaint especially if it involved only actors below the

policy-making level, does not suffice to show a municipal policy") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)).

      For the foregoing reasons, I find that Rhodes has not demonstrated the existence of a triable issue of fact as to her claim against the Police Department.  Summary judgment is thus granted in favor of the Police Department on Rhodes's Section 1983 claim against it.


## CONCLUSION

      Defendants' motion for summary judgment **(Docket # 34)** is **GRANTED in PART and DENIED in PART**.  A trial date status conference will be held with the undersigned at 2310 U.S. Courthouse, Rochester, New York on **September 5, 2013**, at **11:40 a.m.**

**IT IS SO ORDERED.**


                    *s/Marian W. Payson*
                    MARIAN W. PAYSON
                  United States Magistrate Judge

Dated: Rochester, New York
      July __29__, 2013